**ROYCE, Inc.,**

v.

**The UNITED STATES.**

**No. 49977.**

United States Court of Claims.
Nov. 30, 1954.

Alexander M. Heron, Washington, D. C., for plaintiff. Pope, Ballard & Loos, Washington, D. C., were on the brief.

Floyd L. France, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This action was instituted to recover (1) increased rentals as a result of an alleged breach of a lease between plaintiff and the Government wherein the Government allegedly assigned the occupation of a building to the Veterans' Administration in violation of the terms of the lease and (2) the cost to plaintiff of restoring the premises to the condition in which they existed at the time the United States took possession of the same under its lease.

The facts briefly are as follows: The Elks Temple building in Portland, Oregon, is of steel-frame construction, with concrete floors and terra cotta facing. The building was constructed at a cost of $1,250,000 on land valued at $200,000, and was completed not later than 1924. It contains a basement, five full floors, a mezzanine floor, two elevator shafts with four elevators and three principal stairways. The basement area included within the lease contains the elevator shafts and a small lobby, three stairways, corridor space, a gymnasium, handball court, tile swimming pool, a locker room, a dressing room, and some service and storage space. The basement otherwise contains about six large and three small storage rooms, and a room originally designed for use as a barbershop.

The first floor, excluding the store areas not part of the leased premises, contains a main lobby, elevator lobby and shafts, and the stair halls and stairways.

In addition to lobby, corridor, elevator and stairway space, the upper floors provide a number of large rooms and other facilities. The billiard room, lounge, card room, office, ladies room, and writing room are located on the second floor. The third floor has the ballroom, coat rooms, kitchen and banquet hall. The lodge room occupies about two-thirds of the fourth floor, with its ceiling height equivalent to about two floors. The other one-third of the fourth floor provides service space and other club room facilities. The mezzanine floor extends along the lodge room between the fourth and fifth floors. There are 51 bedrooms with toilet and shower facilities, 41 of which are on the fifth floor, and the rest on the mezzanine.

The building has a large air conditioning plant, but no heating plant. Steam for the heating of the building is obtained from a commercial supplier.

The building was occupied by the Elks Lodge until about 1934 when the Pacific Mutual Life Insurance Company acquired it by mortgage foreclosure. The building remained vacant until March 18, 1938, when 54,348 square feet of it was leased to the Works Progress Administration[1] at $900 per month. The lease remained in force until August 1941. During this period various work projects were operated in the building. The main lodge room on the fourth floor was used for a sewing project and three full length strips of the linotile flooring were removed so that the heavy power machines rested directly upon the cement floor. Heavy power machines and tables gouged holes through the linotile floor covering. There was other damage resulting from the Work Projects Administration occupancy. None of the dam-

---

1. The Works Progress Administration was established by Executive Order No. 7034, dated May 16, 1935. The name of the Works Progress Administration was changed to the Work Projects Administration on July 1, 1939, by Reorganization Plan No. 1.

age was repaired by the Work Projects Administration nor by the owner of the premises. The Pacific Mutual Life Insurance Company submitted a claim in the amount of $9,412.37 for damages arising out of the Work Projects Administration occupany. By settlement certificate of March 24, 1934, the Comptroller General awarded the claimant damages in the amount of $4,717.35, which included in full the claim for $1,675 for the linotile flooring in the main lodge room.

Following termination of the Work Projects Administration occupancy, the building remained vacant until a lease was entered into between the Pacific Mutual Life Insurance Company and the United States, acting through the Corps of Engineers, United States Army. The lease covered 66,894 square feet. There was excepted from the lease store space on the first floor and related areas in the basement. The rental was $18,000 per year, payable $1,500 per month.

The term of the lease was for the period beginning December 1, 1942 and ending June 30, 1943, renewable from year to year at the option of the Government by written notice to the lessor at least 30 days before the lease or any renewal thereof would otherwise expire; provided that the term would not be extended beyond six months after the existing emergency and in no event beyond June 30, 2041. The Government reserved the right to cancel the lease or any renewal thereof upon 30 days' written notice.

The lease was duly renewed for the fiscal year commencing July 1, 1943, and by supplemental agreement dated January 6, 1944, the lease was extended to June 30, 1945, and from year to year thereafter without notice, with other provisions of the lease remaining unchanged. The Government's occupancy lasted through June 30, 1948. The lease, as extended, is hereinafter referred to as the 1942 lease.

The 1942 lease was prepared on a standard printed form which contained the provision in article 2 that the leased premises were "to be used exclusively for the following purposes:". To this there

were added the typewritten words "Military purposes." The instructions were part of the printed lease form, and instruction number 3 provides:

"3. The premises shall be fully described, and, in case of rooms, the floor and room number of each room given. The language inserted at the end of article 2 of the lease should specify only the general nature of the use, that is, 'office quarters,' 'storage space,' etc."

At the time of the execution of the 1942 lease, both the lessor and the lessee knew that the premises were to be used as an induction center in the military conscription program of the Government.

Article 8 of the 1942 lease (in printed form except that the last sentence and the word "twenty" in the next to the last sentence were typewritten) provides:

"8. The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to other tenants on the property or in the building in which said premises are located); which fixtures, additions or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted: Provided, however, that if the Lessor requires such re-

storation, the Lessor shall give written notice thereof to the Government twenty days before the termination of the lease. Such notice shall be directed to the Finance Officer, U. S. Engineer Office, Portland District, Portland, Oregon."

The provisions of article 9 of the printed form of the lease, relating to maintenance of the property, were deleted, and a typewritten rider attached, as follows:

"9. The maintenance and repair of the leased premises shall be in general governed as follows:

"a. Lessor shall maintain and keep in good repair the roof, outside walls, foundations, sidewalks and drainage of the leased premises below the street floor.

"b. The elevators shall be inspected at intervals as required by ordinance or law at the Lessor's expense. Mechanical defects and damage caused by obsolescence or fair wear and tear shall be an obligation of the Lessor. Repairs and damage caused by improper or negligent operation shall be maintained and serviced by the Government.

"c. The swimming pool in the basement of the leased premises shall be boarded over at Government expense.

"d. Repairs to interior walls, floors and ceilings when same becomes necessary through structural defects, through fair wear and tear or through circumstances beyond control of the Government shall be an obligation of the Lessor. All other maintenance and servicing shall be at the Government's expense.

"e. Lessor shall take care of all damage, breakage and repairs to doors and outside windows when such is occasioned through fair wear and tear or by circumstances beyond the Government's control.

"f. Heating and plumbing shall be serviced and maintained by the Lessor when obsolescence, fair wear and tear or circumstances beyond control of the Government are primarily responsible for the servicing of same. Maintenance and services from all other causes shall be an obligation of the Government.

"g. The interior wiring is taken over by the Government 'as is' and shall be serviced and maintained by the Government."

The 1942 lease provided that a joint survey be made of the leased space. Such a survey was made by representatives of the lessor and the lessee. The report of the survey was executed by the representatives of both parties December 1, 1942. It is attached to the lease as Exhibit B.

On December 12, 1945, the Pacific Mutual Life Insurance Company conveyed the Elks Temple building to the plaintiff and at the same time assigned to the plaintiff all its interest in the 1942 lease, including rents accrued or accruing. Rental payments thereafter were made to the plaintiff. The leased space was occupied and used as a recruiting and induction center until July 15, 1947. During that time space not required for office purposes was used by other units of the United States and from about 1946 the rehabilitation and education units of the Veterans' Administration occupied approximately 27,000 square feet of space. Effective July 15, 1947, the entire leased space was transferred from the Department of the Army to the Veterans' Administration. The plaintiff was immediately advised of the transfer and requested to submit invoices for rent to the Regional Office of the Veterans' Administration in Portland. There was no substantial change in the use of the building by the Veterans' Administration from the use by the War Department. Considerable correspondence followed in which the plaintiff contended that the use of the leased space by the Veterans' Administration violated the provision of the lease saying that the space was to be used for military purposes and effected a cancellation of the

lease. The plaintiff took no action to obtain possession of the premises but advised the Veterans' Administration that it could continue occupancy at a rental of $3,500 per month. On the other hand, the Veterans' Administration claimed that its use of the leased space did not constitute a violation of the terms of the lease and refused to pay the increased amount requested.

The plaintiff thereafter submitted invoices at the lease rate of $1,500 per month with the statement that payment at that rate would not prejudice its claim for an increased rental subsequent to July 15, 1947. Rent at the rate of $1,500 per month was paid in full through June 30, 1948.

In a further effort to collect an increased rental the plaintiff on January 26, 1948, submitted a claim to the Comptroller General for rental at the rate of $5,000 per month less payments received of $1,500 per month. By settlement certificate dated December 17, 1948, the plaintiff was advised by the Comptroller General in part as follows:

"Your claim for an additional allowance of $24,250 appears to be based upon the allegation that the War Department lease was for military purposes only and that the terms of the lease were violated by that department upon transfer of the premises to the Veterans Administration and that this department became a tenant at the will or sufferance of the lessor.

"An examination of the contract discloses that the premises involved are fully and specifically described in Article 2 of the contract and that the language inserted at the end of the Article specified only the general nature of the use of the premises and is descriptive and not restrictive in nature. Accordingly the Government acted within its rights, under Article 4 of the contract, in transfering the lease to the Veterans Administration.

"I therefore certify that no balance is found due you from the United States."

The principal alteration in the building made by the Army was the removal of a partition between rooms 528 and 530 to provide an X-ray laboratory. False walls were installed in these rooms to support heavy lead sheets for protection against X-ray operations. Room 526 was used as a developing room and its walls were partially leaded; 2 x 4 standards were installed in various areas of the building to support suspended fluorescent lighting fixtures. Temporary plywood partitions were installed in some areas.

By letter of April 29, 1948, the defendant gave plaintiff notice of termination of the lease effective June 15, 1948. The building was vacated and surrendered to the plaintiff June 30, 1948, and rent at the rate of $1,500 per month was paid in full to that date. By letter of May 19, 1948, the plaintiff again advised the defendant that restoration of the leased premises was required in accordance with section 8 of the 1942 lease.

During the period June 21 to 25, 1948, a joint survey of the condition of the leased space was made by representatives of the plaintiff and of the defendant and a report of the survey signed by these representatives is dated July 15, 1948. This report is hereinafter referred to as the "termination survey" and stated, concerning the general condition of the building:

"Generally speaking, the entire building is in need of considerable redecoration and repair. With the exception of those spaces and rooms specifically mentioned hereafter, sidewalls and ceilings on all floors and in all stairwells are in need of repainting.

\*     \*     \*     \*     \*     \*

"Occupancy of the building during the past 8 to 10 years has been by various Government agencies who have provided nominal maintenance to the property to the extent

of their respective lease requirements. There is evidence of neglect and lack of maintenance on the part of the lessor throughout the building as indicated by the haphazard storage of equipment in the rooms in the basement, the rotting out of sidewall skylight screening, minor cracks in the uncovered floors, and the deteriorated condition of the floor covering (linoleum) in certain rooms on floors two and three."

In addition the terminal survey report contains a detailed description of conditions throughout the building.

About the first of August 1948, the Veterans' Administration detailed a crew of men to clean up and repair the leased space. The crew consisted of a maintenance supervisor, two carpenters and a helper, two to four laborers and a crew of electricians. This crew was engaged in the building approximately 11 days.

All temporary installations, including partitions, lighting fixtures and frame supports for fluorescent lighting fixtures, lead sheeting in the X-ray and finishing rooms and false walls supporting the same, were removed. The partitions were self-supporting, but the 2 x 4 standards supporting light fixtures were toenailed into the floor with finishing nails to prevent shifting. The nail holes resulting from the removal of these standards were not filled. Holes in the plaster and other damages resulting from the removal of the temporary installations were repaired. After the removal of the temporary installations, the entire building was cleaned. The defendant did not restore the partition between rooms 528 and 530, which had been removed for an X-ray laboratory. No repair was made of the damages requiring the services of special trades, such as installation of ceramic tile and plumbing fixtures, nor were painting and window washing done. The plaintiff employed the general contracting firm of Ward & Greene to assist in making the joint terminal survey and obtained an estimate from that firm in the amount of $50,176.45 for repairs to the leased space, including cleaning. Ward & Greene estimated carpentry work and obtained bids from subcontractors in specialized trades. The estimates are summarized as follows:

| | |
|---|---|
| Carpentry | $3,079.35 |
| Bathroom floor & wall tile & accessories | 2,238.20 |
| Cleaning building & windows | 1,210.00 |
| Painting | 17,158.92 |
| Floor covering | 8,986.94 |
| Plumbing & plumbing fixtures | 6,850.00 |
| Electrical work | 3,660.00 |
| Plastering | 2,431.54 |
| | 45,614.95 |
| Supervision @ 10 percent | 4,561.50 |
| Total | 50,176.45 |

The foregoing estimates were to put the building in good condition and were not limited to damages beyond ordinary wear and tear occurring during the Government's occupancy under the 1942 lease.

The joint terminal survey expressly stated that it did not attempt to fix responsibility for damages or the extent of restoration required nor to fix the responsibility upon previous tenants. Mr. B. F. Grahn of the Real Estate Division, Veterans' Administration, participated in the joint terminal survey. He submitted an office memorandum of his comparison of the condition report with the terminal survey and the items of damages appearing in the claim of the Pacific Mutual Insurance Company against the Work Projects Administration. The memorandum is dated July 19, 1948, and stated in part:

"3. Comparison of the subject inspection report with the recording of condition of the building as made by the Army Engineers at the time the Army occupied the building and further comparison with the report of settlement between the Government and Pacific Mutual Insurance at the termination of occupancy by the Works Progress Administration

reveals some duplication. Comparison of the three reports was made jointly by Mr. H. F. Nelson and the writer. The duplicated and continuing conditions existing since the time of the other two inspections (Army and WPA) have been noted on the Real Estate Division file copy of the current report by check marks. Those items checked in red were also covered in the WPA report and no liability therefore should be charged against the VA. Those items checked in blue were also covered in the report of inspection of the Army Engineers and the VA should not be held liable for these items either."

The defendant did not accept the estimate of $50,176.45 and thereafter a conference was held between representatives of the plaintiff and the defendant to discuss the restoration. No agreement was reached either as to items of damage for which the Government was responsible or the cost of repairing any particular item. A new list was prepared containing a much smaller number of items and the firm of Ward & Greene on behalf of the plaintiff made an estimate of the cost of repairing these items which totaled $7,409.05. This estimate was submitted to the defendant. The defendant never made an estimate similar to the $50,176.05 estimate of Ward & Greene. An estimate including only the items on the smaller list was made by B. G. Lampe of the Construction Division, Veterans' Administration. Mr. Lampe's estimate dated December 2, 1948, is in the total sum of $3,675. This estimate was submitted to the plaintiff by letter dated December 15, 1948. The plaintiff did not acknowledge defendant's letter and no further negotiations between the parties were undertaken.

The plaintiff and its predecessor performed no maintenance and upkeep of the interior of the building for normal wear and tear. During Army occupancy, periodic inspections were made and floors cleaned and washed monthly. These inspections were not continued after Veterans' Administration occupancy. The Veterans' Administration performed ordinary cleaning but did not wax the floors.

During 1940 the defendant painted the hallways and the rooms on the fifth floor and the fourth floor mezzanine and also painted stairways and lobby walls and one of the elevator shafts. Inlaid linoleum was placed in all mezzanine floor rooms used for office space and in several of the rooms on the fifth floor. These floors had previously been bare concrete. The defendant's maintenance engineer performed ordinary repairs to the plumbing, wiring, ventilating and other similar work in the building. He did not replace broken wall fixtures or perform work requiring special trades.

Much of the maintenance work performed by the defendant during the 1942 lease was necessary by reason of ordinary wear and tear over a long period of time before and during the lease. Much of the leased area was in better condition upon release by the Government than when it was first occupied under the 1942 lease. The joint terminal survey expressly stated that the various Government agencies "have provided nominal maintenance to the property to the extent of their respective lease requirements."

The Elks Temple building was not suited for use as a general office building as it could not be reasonably subdivided to accommodate various tenancies. The only lease experience prior to the 1942 lease was the 1938 Works Progress Administration lease, which was superseded by a new lease in 1940. The plaintiff purchased the property in 1945 for the price of $250,000 which was about the value of the land alone if unimproved. Neither the original cost nor the market value of the premises is a fair basis for determination of its rental value.

There was a substantial increase in occupancy and demand for premium class office space in Portland between 1942 and 1947, but there was no increase in demand during this period for the type of office space provided by the Elks Temple

building. The fair rental value of the leased space for office use during 1947 and 1948, based upon comparable rental for off.ce space in ten other Portland buildings of a similar class, was $18,000 per year or $1,500 per month.

The highest and best use of the Elks Temple building in 1947 and 1948 was for a social club. About March 1, 1949, the plaintiff leased the building, less store space, to the newly organized Cosmopolitan Club. This club was allowed three months' free rent to permit renovation. The lease provided for payment to the plaintiff of a rental of seven percent of the gross receipts with the provision that, if the amount realized after the first year should not exceed $35,000 per year, the lease would become subject to cancellation by the lessor. The Cosmopolitan Club occupied the building until about July 1951 when it went into receivership. It had paid cash rentals totaling $15,822 and expended approximately $37,147.56 for improvements in the building. During 1947 and 1948 there was no building in Portland being occupied for club purposes on a rental basis. There is no satisfactory evidence that prior to 1949 there was in existence any social organization willing and able to lease the Elks Temple building for club purposes. The fair rental value of the leased space for club purposes from July 15, 1947, to June 30, 1948, did not exceed the rental reserved in the 1942 lease of $1,500 per month.

The questions presented are: (1) whether the transfer of the leased space in the Elks Temple building to the Veterans' Administration was in violation of the terms of the lease providing that the space should be used for military purposes; (2) if the use of the leased space by the Veterans' Administration was in violation of the terms of the lease providing that the space should be used for military purposes, did such use effect a termination of the lease; (3) the cost of repairing the damages to the building under the 1942 lease.

The lease provided that the leased space was "to be used exclusively for the following purposes (see instruction No. 3): Military purposes."[2] The instructions were a part of the lease form and instruction No. 3 reads:

"The premises shall be fully described, and, in case of rooms, the floor and room number of each room given. The language inserted at the end of article 2 of the lease should specify only the general nature of the use, that is, 'office quarters,' 'storage space,' etc."

Plaintiff urges that the use by the Veterans' Administration constituted a breach of the lease and gave the owner right of reentry. Defendant says the provisions of the lease are sufficient to show that the use of the words "Military purposes" was intended to describe the use to be made of the premises and not to be restrictive. Furthermore, plaintiff says the use of the leased space by the Veterans' Administration was for military purposes. The latter seems to us to be more logical than the contention of plaintiff. Instruction No. 3 states the words were to "specify the general nature of the use." The words used were very general and supplied general information whereby a proper rental could be determined. Obviously, were the premises to be used for purposes which would cause destruction of the building or greater normal wear and tear, the rent would be much higher. The evidence here shows that the use made by the Veterans' Administration was not substantially different from the use by the Department of the Army. A use for "Military purposes" conceivably might have been much more detrimental to the building than the use received either at the hands of the Army or of the Veterans' Administration. Thus it seems to us the construction of the term "Military purposes" by the Comptroller General in denying plaintiff's claim was correct. The term "Military purposes" as used in

2. The words "Military purposes" were typewritten on a standard printed form of lease.

the lease was "descriptive and not restrictive in nature."

■ That the Veterans' Administration functions under the delegation of power conferred upon Congress by Article 1, Section 7 of the Constitution there can be no doubt. It functions under the power conferred upon Congress by the Constitution to raise and support armies and to provide and maintain a Navy. The chief purpose and function of that administration is to care for men and women after their discharge from the Armed Forces. It provides pensions, health and rehabilitation service, educational advantages, and in other ways alleviates the hardships to veterans which might result by reason of their having served in the Armed Forces of the United States. This is plainly a part of the military—a part of the defense of the United States and waging war against our enemies. Moreover, the Veterans' Administration is the successor to the Bureau of Pensions. The courts have considered pensions a part of the pay and inducement to citizens serving in the Armed Forces. United States v. Hall, 98 U.S. 343, 25 L.Ed. 180; United States v. Fairchilds, D.C.W.D.Mich.1867, 25 Fed.Cas. p. 1035, No. 15,067; United States v. Marks, C.C.D.Ky.1869, 26 Fed. Cas. p. 1162, No. 15,721.

■ Therefore, we believe that the use of the building by the Veterans' Administration did not violate or breach the terms of the lease between plaintiff and the Department of the Army.

Assuming that the use of the leased space by the Veterans' Administration was a violation of the terms of the lease, it is highly doubtful that such use would effect a termination and give the owner right of reentry.

■ The law recognizes three types of restrictions upon the use of property. They are (1) a special limitation, (2) a condition, and (3) a covenant. The plaintiff makes no claim that the 1942 lease created a special limitation. It does appear that plaintiff claims the lease created a condition. Under a condition, a right of entry is created by the occurrence of some event, but the estate is not terminated unless that right is exercised. Plaintiff never exercised the right of entry.

■ As stated *supra* the words "Military purposes" were descriptive and at most created a covenant. The general rule is that the breach by the lessee of the covenants or stipulations on his part contained in the lease does not work a forfeiture of the terms since the lessor's remedy is by way of a claim for damages. 32 Am.Jur., Landlord & Tenant, § 848, p. 720. Cases are legion holding that the courts abhor a forfeiture and they will construe a clause as a covenant rather than a condition if it is possible to do so. Columbia Railway, Gas & Electric Co. v. State of South Carolina, 261 U.S. 236, 43 S.Ct. 306, 67 L.Ed. 629; Stuart v. City of Easton, 170 U.S. 383, 18 S.Ct. 650, 42 L.Ed. 1078; Oregon & California Railroad Co. v. United States, 238 U.S. 393, 35 S.Ct. 908, 59 L.Ed. 1360.

■ We have found the value of the use of the leased space from June 15, 1947 to June 30, 1948 (the period of occupancy by the Veterans' Administration), to be $1,500 per month. The use by the Veterans' Administration was not more detrimental to the building and of substantially the same nature as the use by the Department of the Army. Even assuming there was a breach of the covenant, plaintiff has not shown any damages resulting from such breach.

■ The next question we are called upon to decide is the cost of restoration in excess of ordinary wear and tear. The defendant admits that plaintiff should be compensated by reason of the failure of the Government to make restoration in excess of ordinary wear and tear.

In its petition plaintiff claims damages in lieu of restoration in the amount of $50,176.45. This amount has been reduced in plaintiff's brief to $44,233.51. Defendant says the amount should be $3,675.

Plaintiff relies upon an estimate of the cost of repairs to the building prepared by the firm of Ward & Greene. The esti-

 

mate submitted by Ward & Greene was to put the building in good condition and was not limited to damages beyond ordinary wear and tear. Section 8 of the 1942 lease requires restoration "reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control excepted." Section 9 makes repairs necessary through fair wear and tear or through circumstances beyond the control of the Government an obligation of the lessor. Clearly the Government is not liable for ordinary wear and tear occurring during its occupancy of the premises. Furthermore, the terminal survey report executed by both the plaintiff and the defendant expressly states that the Government agencies had "provided nominal maintenance to the property to the extent of their respective lease requirements." This report also recognized that there had been lack of maintenance on the part of the lessor and also included many items shown to be damaged for which claim was made at the termination of the WPA occupancy. The Ward & Greene estimate of $50,176.-45 completely disregarded the terminal survey report. Thus we feel justified in disregarding this estimate.

At a later date plaintiff and defendant entered into a discussion with a view of determining the items for which the Government was responsible. A new list was prepared and Ward & Greene made a new estimate of the cost of repairing the items on this list. Their estimate totaled $7,409.05, and included ten percent for supervision. Mr. B. G. Lampe of the Construction Division, Veterans' Administration, made an estimate of the same list of items and his estimate totaled $3,675.

Ward & Greene were general contractors in the area and B. G. Lampe was a professional estimator in the employ of a large contractor. In this instance the firm of Ward & Greene was in the employ of the plaintiff and B. G. Lampe was in the employ of the Veterans' Administration.

We believe the last list submitted to plaintiff on which Ward & Greene made an estimate of $7,409.05 and B. G. Lampe made an estimate of $3,675, was a fair representation of the damages to the building in excess of "reasonable and ordinary wear and tear," under section 8 of the 1942 lease. We are aware that ordinarily plaintiff's evidence would tend to be high and defendant's witness would be apt to shade his testimony in favor of the defendant. Believing the estimate of $7,409.05 to be high and the estimate of $3,675 to be low, we know of no better method than that of applying the jury technique and "splitting the difference." This would leave us a figure of $5,542.-05, which we believe to be the fair and reasonable cost of restoration of the building under the 1942 lease.

We conclude, therefore, that the transfer of the leased space in the Elks Temple building to the Veterans' Administration was not in violation of the terms of the 1942 lease. That plaintiff is entitled to judgment in the sum of $5,542.05, the cost of restoration of the building under the 1942 lease.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.