ALICE C. CALDEIRA, ADMINISTRATRIX OF THE ESTATE OF ANTONE M. CALDEIRA, DECEASED, *v.* RYOJU SOKEI.

No. 4429.

August 17, 1966.

RICHARDSON, C. J., CASSIDY, WIRTZ, LEWIS, JJ., AND CIRCUIT JUDGE OGATA IN PLACE OF MIZUHA, J., DISQUALIFIED.

OPINION OF THE COURT BY CASSIDY, J.

This is an appeal from a judgment dismissing an action filed on June 3, 1958, by Antone M. Caldeira, hereinafter referred to as plaintiff,[1] for damages for

---

[1] Mr. Caldeira died in 1960 before his action was brought to trial. His widow as administratrix of his estate was substituted as party plaintiff.

breach of contract claimed to have occurred under the facts we will endeavor to highlight in this opinion. A counterclaim was also dismissed by the judgment but no appeal has been taken from that ruling.

In the early part of 1955 Elmer Sokei, manager of the Sokei Dairy on Kauai, proposed to plaintiff, who owned and operated a dairy on Oahu, that he move his herd to Kauai and establish a dairy there to produce milk for purchase and distribution by Sokei Dairy. Plaintiff accepted the proposal. A written agreement to effectuate the proposed arrangement was executed on April 16, 1955. It was signed by plaintiff as producer and by Elmer Sokei for Sokei Dairy as the distributor. Elmer was a son of Ryoju Sokei, the owner of Sokei Dairy, who will be referred to as the defendant hereinafter.

The term of the agreement was for 10 years. It spelled out in detail prices, quality, quantity, and other terms and conditions for delivery and distribution of the milk to be produced by plaintiff and it also contained the following three paragraphs:

"17. *LAND LEASE:* The terms and conditions of this milk purchase agreement are further contingent on granting by Distributor to Producer of a 10-year lease, covering the same period as the milk purchase agreement, of that certain parcel of real estate more definitely described as Lots 12 to 15, Teves Tract, Kapaa, tax key 4-6-20-16, and comprising an area of 11.561 acres, more or less.

"18. *CONDITIONS OF TENANCY:* Producer agrees to make all necessary improvements to said real estate, and to provide, erect and maintain such structures and facilities as it may require.

"19. *TERMS OF LEASE:* The Producer is to have the use of said real estate without payment of rental charge for the first 12 months of this contract

period, and shall start paying land rental at the rate of $30 per month starting after the first year."

After the execution of the contract plaintiff shipped his entire dairy herd of 54 head from Oahu to Kauai. The herd was kept at the Sokei Dairy until, as required by Paragraph 18 of the agreement, plaintiff had constructed barns and other improvements on the parcel of land referred to in Paragraph 17. Thereafter plaintiff moved his herd to the new site. He purchased additional cows to bring his milk production up to the point where he was able to make minimum delivery of 800 quarts a day as specified by the agreement. From and after April 1956 he paid the $30 monthly rental specified by Paragraph 19 of the agreement by checks drawn to the order of Sokei Dairy.

There appears to have been no differences between the parties while Elmer was manager of the dairy. He died on July 6, 1956. Some 10 months after Elmer's death the incident hereunder related was followed in quick order by the termination of business relations between the parties and in plaintiff's selling his dairy herd and moving back to Oahu.

On the morning of May 16, 1957 Edwin Caldeira, son and employee of plaintiff, trucked the usual daily quota of 20 cans of milk to defendant's dairy. Ryoko Sokei, defendant's son in charge of Sokei Dairy's milk processing plant, refused to accept the delivery on the asserted grounds that Edwin had been mishandling the cans in unloading them and was causing damage to both the cans and the landing dock. Edwin denied the charge but Ryoko refused to give the customary receipt for the delivery and also refused to turn over to Edwin the empty cans which would be required to make the next day's delivery of milk. Edwin testified on cross-examination that Ryoko said "we don't need your milk" and that it was his understanding

from what Ryoko told him Ryoko meant he "should never show up again with any more milk." The 20 cans of milk were left on the dock to spoil and were dumped some two days later.

On the afternoon of May 16 plaintiff went to Sokei Dairy and asked that he be given the empty cans needed for the next delivery of milk. Ryoko complained of the purported mishandling of the cans by Edwin and stated that the Caldeiras were not going to get any more cans unless there was assurance that the cans would be properly handled. No such assurance being given, Ryoko persisted in his refusal to give plaintiff the necessary empty cans and plaintiff left the premises with the terse ultimatum, "No cans, no milk."[2]

Plaintiff went to Honolulu the next morning to consult his then attorney, the late O. P. Soares.[3]

There is evidence to the effect that upon learning of the impasse, defendant, who was sick in bed at the time, directed his son Ryoko to go to the plaintiff, try to mend their differences and to deliver empty milk cans. These instructions were disregarded by Ryoko. Defendant then directed another son, Takato Sokei, to approach Mr. Caldeira and arrange for resumption of deliveries. Takato testified that he went to the Caldeira home on May 17 and upon learning that the plaintiff was in Honolulu, left a message with the plaintiff's wife that Sokei Dairy desired to resume relations under the milk contract.

Mrs. Caldeira admitted that Takato called at the Caldeira home on May 17 but she denied that any such

---

[2] No mention is made in the contract as to whose responsibility it was to furnish containers for delivering milk. However an independent dairyman testified that custom and practice in the milk trade required the distributor to furnish the producer with sterilized cans for that purpose. That was the actual practice followed in this case during the time the parties were adhering to their contract.

[3] Mr. Soares was counsel for plaintiff when this action was filed in 1958. A few months later he withdrew from the case.

message was delivered by him. She testified that when Takato learned that plaintiff was in Honolulu he merely asked what happened and was told that she didn't know and that he would have to see her husband when he returned. The testimony of a daughter of the plaintiff was to the same effect.

There is evidence that two third parties on their own initiative tried to bring plaintiff and defendant together but to no avail. One of them, a Board of Health Inspector who had been present when plaintiff confronted Ryoko on the afternoon of May 16, said that later the same afternoon he went to plaintiff's dairy, found him milking his cows onto the barn floor, asked if he could help out with Ryoko, and that plaintiff declined the offer and said his son was going to see a lawyer.

Norito Kawakami, attorney for some members of the Sokei family, testified that within a day or two of May 16 he telephoned Mr. Soares in Honolulu and that he "spoke to him about getting milk deliveries resumed and he informed me that this was not possible, that they were going to sue."

On June 3, 1957, plaintiff sold his entire dairy herd to a purchaser on Kauai. Three weeks later he and his family left Kauai and returned to Honolulu to live.

It was brought out on the trial that the parcel of land referred to in Paragraph 17 of the milk purchase agreement was owned by Elmer Sokei. It was devised to his widow, Tomiko Yaka Sokei. Probate of Elmer's estate was closed in August 1957. There was no evidence plaintiff was aware when the contract was executed that defendant was not the owner of the parcel. It was stipulated during the trial that no lease to cover the parcel was ever executed. One of the stipulations noted in the pretrial order was, "That on June 7, 1957 Mrs. Tomiko Yaka Sokei served notice upon plaintiff to vacate the premises

concerned." The form of the notice is not shown by the record. There is nothing in the record as to whether there was ever a tender or a demand for a lease. The inference is that neither occurred.

The case was tried jury waived. The court filed a written decision in which it made certain findings of fact resorting in part to testimony given, by plaintiff and others, in another suit previously heard by the court and in which apparently plaintiff prevailed on an assumpsit basis for milk delivered to defendant in May 1957, prior to the disruption of relations between the parties. None of the testimony so resorted to was admitted on the trial or appears in the record and such testimony is consequently not before us. *State* v. *Hawaiian Dredging Co.*, 48 Haw. 152, 156, 397 P.2d 593, 597. However, the basis for the court's ultimate ruling against plaintiff on the amended complaint upon which the case went to trial was actually confined to a ruling of law on construction of the contract.

The court's decision proceeded on the premise that proper disposition of the case necessitated determination of the following:

"a—Whether or not the so-called milk purchase agreement, being Plaintiff's Exhibit No. 1, was a legal and enforceable contract; and

"b—If it be determined that Plaintiff's Exhibit No. 1 is a legal and enforceable contract, whether or not on May 16, 1957, or any time thereafter, there was a termination of contractual relationship by either plaintiff, or defendants or any of the defendants."

While the pleadings and the pretrial order entered in the case put in issue the ownership of Sokei Dairy and the authority of Elmer to execute the agreement of April 16, 1955 on behalf of Sokei Dairy, the evidence definitely established, and the trial court found, that Sokei Dairy

was solely owned by Elmer's father, Ryoju Sokei, and that Elmer was fully authorized to execute the agreement on his father's behalf. So finding, the court held that the agreement was a valid and binding contract between plaintiff and the defendant but ruled that it was unenforceable. The court reasoned and held that under the provisions of Paragraph 17 of the agreement, "the granting by defendant to plaintiff of a ten-year lease covering the same period as the milk purchase agreement of certain described premises was made a condition precedent to the enforceability of the terms and conditions therein."

The decision concluded as follows: "Upon a thorough review of the circumstances surrounding the execution of the milk purchase agreement, to wit, Plaintiff's Exhibit No. 1, and also the clear and specific language used in agreement numbered '17' therein, it is the conclusion of this Court that all the terms and conditions set forth in such agreement were obviously geared to and made contingent on the ten-year lease referred to therein. No such lease was ever executed, and accordingly, this action for breach of contract cannot be sustained. The action against the defendants is ordered dismissed, and defendants' counterclaims are likewise ordered dismissed."[4]

We cannot accept the trial court's analysis or application of the provisions of Paragraph 17.

In our view the contingency covered by Paragraph 17 was clearly for the accommodation, benefit and protection of the plaintiff and the stipulation in respect thereto con-

---

[4] In addition to Ryoju Sokei the complaint named as defendants three of his sons, Elmer's widow, individually and as executrix of Elmer's Estate, and a family corporation which had been formed in the latter part of 1958 to take over the Sokei Dairy. Upon motion made at the conclusion of the trial the action was dismissed as to all defendants except Ryoju Sokei and Elmer's widow in her fiduciary capacity. In this court the action was discontinued against the widow as executrix. This appeal reserves and keeps alive the action against Ryoju Sokei alone.

stituted a promise undertaken by defendant and may not be converted to a condition determinative of defendant's liability under the contract to take milk.

The lease site was approximately 400 yards from Sokei Dairy. This undoubtedly was a convenience to both parties, but obviously much more so for plaintiff than for defendant. However, what plaintiff was required to deliver and defendant entitled to demand under the agreement was milk in a specified minimum quantity which had been handled in a specified manner and would test to quality standards meticulously set out in the agreement. Where the milk was produced, if meeting the standards of quantity and quality, could hardly have meant anything to defendant.

There is no provision in the agreement which expressly restricts plaintiff to the Teves Tract site. On the other hand there are provisions which indicate that plaintiff could deliver and defendant would be required to take milk produced by plaintiff elsewhere than at the Teves Tract site. For instance, in the preliminary recitals of the agreement it is stated: "(a) Producer is engaged in the business of producing milk *on its farms* located in the Territory of Hawaii"; and "(c) Producer desires to procure an outlet for the milk now and hereafter produced by its dairy herd *on its farm or farms* in the Territory of Hawaii * * *." Further, the first paragraph of the agreement proper provides, "Distributor agrees to buy, and Producer agrees to sell and deliver to Distributor, a minimum quantity of 800 quarts per day of milk of the quality hereinafter specified, upon the terms and conditions and at the prices hereinafter specified, *Distributor agreeing to purchase all of the milk produced by Producer on Producer's ranches located in the Territory of Hawaii.*"

While no benefit to defendant can be discerned from requiring location of plaintiff's dairy on the premises re-

ferred to in Paragraph 17, the reason and necessity for providing the site as an accommodation to plaintiff is readily apparent when it is considered that the proposal made to him to produce milk for defendant called for the removal and transportation of plaintiff's entire dairy herd from Oahu to Kauai.

The provisions of Paragraph 17 to provide the accommodation specifically call for "granting by Distributor to Producer of a 10-year lease" of Lots 12 to 15 of the Teves Tract. The reasonable import of these words of the contract in our opinion implies an obligation on defendant to furnish the plaintiff with a lease of the described premises. Defendant had the duty of tendering the lease. The fact that defendant did not own the site would not relieve him of his obligation. Presumably defendant had an agreement or understanding with Elmer which in effect granted defendant the equivalent of an option to permit fulfillment of his obligation to plaintiff.

While we believe that the language of Paragraph 17 spells out a promise on the part of defendant and not a condition for his benefit, still if there could be considered to be any doubt on that score we would have no difficulty in resolving and would feel compelled to resolve the doubt in favor of plaintiff in accordance with the applicable principle set out in Restatement, *Contracts,* § 261 (1932), that "Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise; * * *." As stated in *Royce, Inc.* v. *United States,* 130 C. Cls. 115, 126 F. Supp. 196, 204: "Cases are legion holding that the courts abhor a forfeiture and they will construe a clause as a covenant rather than a condition if it is possible to do so." See also *Britex Co.* v. *Schwab & Sons, Inc.,* 139 Pa. Super. 474, 12 A.2d 473, 478; *Bank of America Nat. T. & Sav. Ass'n* v. *Maryland Cas. Co.,* S.D. Cal., 37 F. Supp. 677, 683-84; *Larson* v.

*Thoreson,* 116 Cal. App. 2d 790, 254 P.2d 656, 658.

Since plaintiff's failure to obtain a formal lease was, as far as the record in this case shows, due to the failure of defendant to fulfill the obligation he assumed under Paragraph 17, it should be axiomatic that he may not set up his own default in that respect to defeat whatever redress, if any, plaintiff may be entitled to under his claim that defendant breached the contract. As is stated in *Stevens* v. *Howard D. Johnson Co.,* 4 Cir., 181 F.2d 390, 393, "It would seem to be elementary that, where a contract contemplates action by a party, he cannot absolve himself of liability by failing or refusing to take the action." *Cf., Ikeoka* v. *Kong,* 47 Haw. 220, 386 P.2d 855, in which, citing *Sibbald* v. *The Bethlehem Iron Co.,* 83 N.Y. 378, it is stated (at p. 228) : "[N]o one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance." See also *Itzkowitz* v. *Fertitta,* Sup. Ct., Kings Co., 76 N.Y.S. 2d 156, 158; *Public Market Co.* v. *Portland,* 171 Or. 522, 130 P.2d 624, 650; *Howley* v. *Scranton Life Ins. Co.,* 357 Pa. 243, 53 A.2d 613, 616; *Walley* v. *Fred W. Mears Heel Co.,* S.D. Me., 4 F. Supp. 277, 278.

While the trial court in its decision did consider other points and to an extent resolved some of the conflicts in the evidence, the lower court's attention was focused on and, as has been shown, the case was decided on the specific issue of the enforceability of the contract. Having concluded that the contract was unenforceable the trial court did not attempt to determine the second issue recognized and mentioned in its decision, namely, as to "whether or not on May 16, 1957, or any time thereafter, there was a termination of contractual relationship by either plaintiff, or defendants or any of the defendants." Before this court the cases on both sides have been presented on the basis that the question involved on the

appeal was whether or not the enforceability of the contract was contingent on the existence of a lease. Under the circumstances we do not deem it advisable to attempt to go beyond the one point we have discussed in this opinion. We are not to be taken as expressing or intimating any view on any of the other questions or issues, of fact or law, that are or on a new trial may be presented in the case.

Reversed and remanded for new trial.

*Frederick J. Titcomb,* for plaintiff-appellant.

*Henry T. Hirai* (*Norito Kawakami* and *Mirikitani, Mirikitani & Hirai* of counsel) for defendant-appellee.